The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 21, 2019

## 2019COA46

**No. 18CA0417, *People in the Interest of A.N-B.* — Juvenile Court — Dependency and Neglect — Termination of the Parent-Child Relationship — Expert Testimony; Attorneys and Clients — Attorney-Client Privilege**

A division of the court of appeals concludes that when an indigent party in a dependency and neglect case is provided with an expert at state expense, the attorney-client privilege does not attach to the expert's report regarding a parent-child interactional assessment. In so doing, the division concludes that the holding in *D.A.S. v. People*, 863 P.2d 291 (Colo. 1993), was not affected by recent legislation transferring the authority for budgetary review and approval of a state-paid expert from the court to the office of respondent parents' counsel.

COLORADO COURT OF APPEALS                                    **2019COA46**

Court of Appeals No. 18CA0417
Jefferson County District Court No. 17JV31
Honorable Ann Gail Meinster, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of A.N-B., I.N-B., I.N-B., and A.N-B., Children,

and Concerning D.B. and R.N.,

Respondents-Appellants.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE TOW
Taubman and Berger, JJ., concur

Announced March 21, 2019

Ellen G. Wakeman, County Attorney, Sarah L. Oviatt, Assistant County
Attorney, Golden, Colorado, for Petitioner-Appellee

Diana M. Richett, Guardian Ad Litem

Ingelhart Law Office LLC, Kimberly A. Ingelhart, Glenwood Springs, Colorado,
for Respondent-Appellant D.B.

The Morgan Law Office, Kris P. Morgan, Colorado Springs, Colorado, for
Respondent-Appellant R.N.

¶ 1 Mother, D.B., and father, R.N., appeal the juvenile court's judgment terminating their parent-child relationships with A.N-B., I.N-B., I.N-B., and A.N-B. We affirm.

I. Background

¶ 2 The family has been involved with child protective services agencies on two prior occasions. In January 2014, the Adams County Department of Human Services opened a voluntary case with the family after one of the boys suffered a fractured femur while in father's care. The child was then six months old. The injury was not explained. The case was closed in June 2014.

¶ 3 In September 2014, the same child suffered another fractured femur and fractured ribs. At the same time, the other twin was found to have healing fractures to his ribs, skull, and forearm. The Adams County Department of Human Services opened a dependency and neglect case. The case was closed with mother having full custody of the children, supervised visitation for father, and a permanent protection order barring father from contact with the boy who had suffered fractured femurs.

¶ 4 In this case, in January 2017, the Jefferson County Division of Children, Youth, and Families filed a petition in dependency and

neglect after mother left the three-year-old twins home alone for over six hours. Neighbors reported that the children were screaming and crying. Police arrived to find the children locked in a bedroom with no food or water. The room smelled of urine, and the home was extremely dirty. The Division removed the children and placed them with their maternal grandfather, where they remained throughout the proceedings.

¶ 5    The juvenile court adjudicated the children dependent and neglected. In March 2017, the court adopted treatment plans for the parents. On August 28, 2017, the guardian ad litem (GAL) filed a motion to terminate the parent-child relationships. Over three days in December 2017 and January 2018, the court conducted an evidentiary hearing on the motion to terminate. In January 2018, the court terminated both parents' parental rights.

## II.    Analysis

### A.    The Juvenile Court Did Not Violate Mother's Attorney-Client Privilege

¶ 6    Mother contends that the juvenile court violated her attorney-client privilege when it required disclosure of a report

drafted by mother's expert and admitted the report and the expert's testimony at the termination hearing.  We disagree.

### 1.    Additional Background

¶ 7    Before the hearing, mother requested appointment of an expert in child psychology to evaluate her parenting time.  Due to mother's indigency, the expert was appointed at state expense pursuant to section 19-3-607(1), C.R.S. 2018.  The expert conducted a parent-child interactional evaluation, which included a clinical interview of mother and direct observation of mother interacting with each of the four children.  Based on the expert's report, mother elected not to call the expert as a witness.

¶ 8    Just prior to the hearing, the GAL requested that the expert's report be disclosed to her.  Mother objected, asserting that the report was protected by attorney-client privilege.  The juvenile court ordered the report disclosed and permitted the GAL to call the expert to testify to the results of his evaluation at the termination hearing.

### 2.    Standard of Review

¶ 9    We review the juvenile court's resolution of discovery issues for an abuse of discretion.  *People in Interest of A.D.T.*, 232 P.3d 313,

316 (Colo. App. 2010). We also review the juvenile court's evidentiary rulings for an abuse of discretion. *People in Interest of M.V.*, 2018 COA 163, ¶ 52. A juvenile court abuses its discretion "when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of E.R.*, 2018 COA 58, ¶ 6. The application of the attorney-client privilege is a question of law we review de novo. *People v. Trammell*, 2014 COA 34, ¶ 9.

### 3. State-Paid Experts and the Attorney-Client Privilege

¶ 10 In 1977, the Colorado legislature enacted the Parent-Child Legal Relationship Termination Act of 1977. Ch. 248, 1977 Colo. Sess. Laws 1026-1032. In this Act, the legislature provided that "[a]n indigent parent has the right to have appointed one expert witness of his own choosing whose reasonable fees and expenses, subject to the court's review and approval, shall be paid by the state of Colorado pursuant to section 19-11-110." Sec. 1, § 19-11-107(1), 1977 Colo. Sess. Laws at 1028. Ten years later, when the legislature repealed and reenacted the Colorado Children's Code, this provision was relocated to section 19-3-607, altering only the section reference to the new section 19-3-610. Ch. 138, sec. 1, § 19-3-607(1), 1987 Colo. Sess. Laws 790. The provision has since

4

been substantively amended only once, when the legislature transferred the budgetary review and approval of the expert's fees and costs from the court to the office of the respondent parents' counsel. Ch. 216, sec. 1, § 19-3-607(1), 2016 Colo. Sess. Laws 830.

¶ 11     When an indigent parent's attorney requests the appointment of an expert under this provision, the attorney-client privilege generally protects communications between the parent and the expert. *B.B. v. People*, 785 P.2d 132, 138 (Colo. 1990) (interpreting section 19-11-107(1), C.R.S. 1986). However, this privilege "is not absolute." *D.A.S. v. People*, 863 P.2d 291, 295 (Colo. 1993). In other words, "under a variety of circumstances the cloak of confidentiality afforded by the attorney-client privilege does not extend to particular communications between an attorney (or his agent) and a client." *Id.* For example, the "privilege applies only to statements made in circumstances giving rise to a reasonable expectation that the statements will be treated as confidential." *Id.* (quoting *Lanari v. People*, 827 P.2d 495, 499 (Colo. 1992)).

¶ 12     In *B.B.*, the expert was retained to conduct a disability evaluation of the parent, which included administering intelligence and personality tests as well as interviewing the parent. 785 P.2d

at 134-35. The People called the expert to testify in their case-in-chief, over the parent's objection. *Id.* The supreme court ruled that, because the expert was an agent of the parent's attorney, the attorney-client privilege protected confidential communications between the parent and the expert. *Id.* at 139.

¶ 13 Three years later, the supreme court addressed the issue in a different context. In *D.A.S.*, the supreme court held that the attorney-client privilege did not attach to the testimony and report of an expert who conducted a parent-child interactional assessment. 863 P.2d at 295-96. In distinguishing *B.B.*, the court focused on several factors, including that (1) much of the expert's testimony concerned his observations of the children, not the parent's statements; (2) the parent's attorney knew, before the expert's appointment, that the expert would likely conduct the parent-child interactional evaluation; (3) there was no request to forego the evaluation; (4) the children participated in the evaluation of the parent and themselves; (5) the children's participation was not necessary to make the evaluation possible; and (6) the expert's report had been given to opposing counsel before trial. *Id.* at 296.

4. Application

¶ 14    The facts of this case are far more similar to those in *D.A.S.* than to those in *B.B.*  Mother hired an expert in child psychology to evaluate her parenting ability through a parent-child interactional evaluation.  After reviewing the expert's report, mother decided not to call him as a witness.

¶ 15    However, the GAL moved to compel disclosure of the expert's report.  The juvenile court found that *D.A.S.* was dispositive of the issue and granted the motion.  At the termination hearing, the juvenile court admitted the expert's report and testimony over mother's objection.

¶ 16    With regard to the parent-child interactional evaluation, much of the expert's testimony concerned his observations of the children and, thus, did not fall within the scope of the privilege.  *See id.* at 294 (attorney-client privilege protects communications between parent and expert, not expert's observations and conclusions regarding children).  In addition, the expert testified regarding the clinical interview he conducted with mother.  However, he testified that this interview was integral to the parent-child interactional evaluation.

¶ 17     Mother's attorney requested the evaluation of mother's parenting skills and asked that the children participate. Thus, mother's attorney knew the expert would conduct the evaluation, desired it to occur, and requested the children's participation.

¶ 18     True, the expert's report was not disclosed to opposing counsel until the court granted the GAL's request to do so. This fact is different than *D.A.S.*, where it appears the expert himself provided a copy of his report to all counsel. However, under the statute in effect at the time, the GAL in *D.A.S.* was likely entitled to the report without having to request it.[1]

¶ 19     Finally, and in our view most significantly, the expert advised mother, both orally and in writing, that the evaluation and interview would not be considered confidential and were being conducted to inform the juvenile court with respect to the dependency and neglect proceeding. Thus, mother had no expectation of privacy in the results of the evaluation or the clinical interview. *See Lanari,*

---

[1] The statute in effect at the time (as well as the current statute) required any report from a court-ordered evaluation to be provided to counsel prior to the hearing. § 19-3-607(2), C.R.S. 1990. Because the court appointed the expert, the expert's report was essentially court-ordered. *See People in Interest of D.A.S.,* 863 P.2d 291, 295 (Colo. 1993).

8

827 P.2d at 499. Indeed, even *B.B.* acknowledged that the privilege only attaches to confidential communications. 785 P.2d at 139.

¶ 20 Mother urges us to follow the reasoning of the dissent in *D.A.S.* We, of course, cannot do so, as we are bound by the supreme court's majority opinion. *In re Estate of Ramstetter*, 2016 COA 81, ¶ 40.

¶ 21 Mother also argues that the law has changed since the decision in *D.A.S.* But as noted, the only statutory change that has occurred is the shift in responsibility for the approval of experts to the office of the respondent parents' counsel. In other words, a parent is now able to retain an expert without a court order. One (perhaps unintended) result of this change is that fewer expert reports will be court-ordered, and therefore fewer will automatically be subject to disclosure under section 19-3-607(2), C.R.S. 2018. Nevertheless, because the juvenile court did not order disclosure pursuant to section 19-3-607(2), this statutory change does not alter our analysis.

¶ 22 Thus, we conclude that the juvenile court did not violate mother's attorney-client privilege when it required disclosure of the expert's report and admitted the report and the expert's testimony.

### B. The Juvenile Court Properly Terminated Mother's Parental Rights

¶ 23    A court may terminate parental rights if it finds by clear and convincing evidence that (1) the parent has not complied with an appropriate, court-approved treatment plan or the plan was unsuccessful; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time. § 19-3-604(1)(c).

¶ 24    "The credibility of the witnesses and the sufficiency, probative effect, and weight of the evidence, as well as the inferences and conclusions to be drawn from it, are within the discretion of the trial court." *People in Interest of D.B-J.*, 89 P.3d 530, 532 (Colo. App. 2004).  We will uphold the juvenile court's findings and conclusions unless they are so clearly erroneous as to find no support in the record.  *People in Interest of C.A.K.*, 652 P.2d 603, 613 (Colo. 1982).

### 1. Mother Did Not Successfully Comply with Her Treatment Plan

¶ 25    As an initial matter, we reject mother's contention that the lack of reasonable efforts by the Division rendered her treatment plan inappropriate.  Mother's argument conflates two distinct

issues: (1) the appropriateness of the treatment plan and (2) whether the Department made reasonable efforts to rehabilitate the parent. Before a court may terminate a parent-child relationship, it must find that

> (1) the parent has not reasonably complied with an appropriate treatment plan, the plan has been unsuccessful, or the court had previously found that an appropriate plan could not be devised; (2) the parent is unfit; and (3) the parent's conduct or condition is unlikely to change within a reasonable time.

*People in Interest of L.M.*, 2018 CO 34, ¶ 27.

¶ 26    "In determining unfitness, conduct, or condition," the juvenile court must also consider whether the Division made reasonable efforts to rehabilitate mother. § 19-3-604(2)(h). But the question of reasonable efforts is not related to the appropriateness of the treatment plan. Instead, the appropriateness of a treatment plan is measured in light of facts existing at the time of the plan's approval. *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005). Thus, the Division's later efforts to implement the plan have no bearing on whether or not the plan was appropriate.

¶ 27    The GAL asserts that we should not address mother's contention that she reasonably complied with her treatment plan

because she did not raise the issue in the juvenile court. Divisions of this court have split on the question of whether a parent must specifically preserve issues by raising specific arguments related to each of the statutory criteria, or if failing to do so results in a waiver of appellate review as to the criteria not challenged. *Compare People in Interest of S.N-V.*, 300 P.3d 911, 916 (Colo. App. 2011) (holding that a parent's failure to object to services does not bar appellate review of a reasonable efforts finding), *with People in Interest of D.P.*, 160 P.3d 351, 355-56 (Colo. App. 2007) (declining to review reasonable efforts finding because parent failed to object in the trial court to the services provided). We need not pick sides in this case because even if we assume mother preserved her claim, we discern no error.

¶ 28    The parent is responsible for assuring compliance with and success of the treatment plan. *People in Interest of R.J.A.*, 994 P.2d 470, 472 (Colo. App. 1999). "[P]artial compliance, or even substantial compliance, may not be sufficient to correct or improve the parent's conduct or condition." *People in Interest of A.J.*, 143 P.3d 1143, 1151 (Colo. App. 2006).

¶ 29     When, as here, a dependency and neglect proceeding involves a child under the age of six, a court cannot find that a treatment plan has been successful if the parent exhibits the same problems addressed in the treatment plan without adequate progress, including improvement in the relationship with the child, and is unable or unwilling to provide nurturing and safe parenting sufficiently adequate to meet the child's physical, emotional, and mental health needs and conditions.  § 19-3-604(1)(c)(I).

¶ 30     The juvenile court found that mother had not resolved the protective concerns addressed in her treatment plan.  In particular, mother still did not recognize the danger that father posed to the children.  The caseworker testified that mother continued to steadfastly refuse to consider the possibility that father had abused the children despite the children's severe injuries and their reports of physical abuse.  *See People in Interest of C.T.S.*, 140 P.3d 332, 334 (Colo. App. 2006) (a parent who chooses to remain in a relationship with someone who poses a threat to the child's welfare may be deemed unfit if such conduct prevents the parent from providing adequate protection).

¶ 31    The court also found that mother did not have a healthy relationship with the children.  The child psychologist testified that mother struggled to manage the children and they did not see her as having authority.  The caseworker testified that mother had not progressed beyond therapeutic visits when she visited all four children together, and still had supervised visitation when she visited with the two boys or the two girls separately.  The caseworker was concerned that the children would regress if they returned to mother's care at that time.

¶ 32    Thus, the record supports the juvenile court's finding that mother's treatment plan was not successful because she continued to exhibit the same problems addressed in the treatment plan without adequate improvement.  Further, she was unable to provide nurturing and safe parenting adequate to meet the children's physical, emotional, and mental health needs and conditions. § 19-3-604(1)(c)(I).

### 2.    Mother Was Not Entitled to More Time to Comply with Her Treatment Plan

¶ 33    Mother contends that the juvenile court erred when it terminated her parental rights without affording her a reasonable

14

time to comply with her treatment plan. *See People in Interest of D.Y.*, 176 P.3d 874, 876 (Colo. App. 2007) (a parent must be given a reasonable time to comply with an appropriate treatment plan before parental rights can be terminated). We perceive no error.

¶ 34    Mother received services for approximately ten months after the court approved her treatment plan. *Cf. People in Interest of T.S.B.*, 757 P.2d 1112, 1113 (Colo. App. 1988) (nine months from adoption of treatment plan to termination was reasonable); *People in Interest of R.B.S.*, 717 P.2d 1004, 1006 (Colo. App. 1986) (same). It was mother's responsibility to use those services to get the help she needed to comply with her treatment plan. *People in Interest of J.C.R.*, 259 P.3d 1279, 1285 (Colo. App. 2011). In this context, "[a] reasonable time is not an indefinite time, and it must be determined by considering the physical, mental, and emotional conditions and needs of the child." *A.J.*, 143 P.3d at 1152. Courts may also consider the parent's social history, the chronic or long-term nature of the parent's conduct or condition, and whether any change has occurred during the pendency of the dependency and neglect proceeding. *Id.*

¶ 35    The psychologist noted that this was the second time the family had been involved in a dependency and neglect proceeding. He testified that episodes of such involvement were extremely rare in the general population, so multiple episodes in one family presented a notable risk factor. He opined that a parent's history and ability to respond to intervention over time were the best predictors of the parent's future behavior. He observed that, despite considerable intervention, mother still did not recognize her parenting deficits. Thus, the psychologist concluded that it would be very difficult for mother to make substantive changes.

¶ 36    The caseworker testified that mother needed at least an additional six months of therapy. In addition, the caseworker saw a significant protection concern in mother's ongoing, covert contact with father despite having completed a treatment plan in a prior dependency and neglect case that required her commitment to keep father away from the children.

¶ 37    The juvenile court found that, although mother had made genuine efforts, she did not understand the danger father posed to the children or the effects of domestic violence on the children. The court found that mother would need a lot more therapy before it

would be safe to return the children to her. The court noted that the case was subject to the expedited permanency planning guidelines because the children were under six years old. *See* §§ 19-1-102(1.6), 19-1-123, 19-3-702(2.5), 19-3-703, C.R.S. 2018.

¶ 38 Thus, we conclude that the juvenile court did not err when it terminated mother's parental rights without affording her more time to comply with her treatment plan.

### C. Father Was Not Entitled to More Time to Comply with His Treatment Plan

¶ 39 Father contends that the juvenile court erred when it terminated his parental rights without affording him a reasonable time to comply with his treatment plan. We perceive no error.

¶ 40 The determination of a reasonable period to comply with a treatment plan is necessarily fact-specific, and what constitutes a reasonable time may vary from case to case. *D.Y.*, 176 P.3d at 876.

¶ 41 The Division argues that father failed to preserve this issue because, though it was mentioned in father's opening statement, it was not addressed at all in his closing argument. As we discussed above in relation to mother's preservation, we again need not decide

whether father preserved this claim because even if we assume he did, we discern no error.

¶ 42    Father asserts that (1) the only component of his treatment plan with which he was not in compliance was visitation; (2) he could not comply with the visitation provisions due to a criminal protection order; (3) the GAL had fought his attempts to modify the protection order; (4) a hearing on the protection order was set for two weeks after the termination hearing; and (5) thus, it was possible he would soon be able to begin visitation.

¶ 43    But evidence at the termination hearing contradicted father's assertion that visitation could begin almost immediately and was the only barrier to successful completion of his treatment plan.

¶ 44    Father testified that he had no idea how each of the boys had sustained injuries that included fractured bones.  He did not believe the children were afraid of him.

¶ 45    In contrast, the boys' therapist testified that the boy who had suffered two fractured femurs reported that father had squeezed his leg and twisted it, which hurt a lot.  He said that father hurt him and locked him in his room.  The therapist said both boys talked about father spanking them, hurting them, and being mean.  She

18

testified that both boys had post-traumatic stress disorder and were hypervigilant and fearful.

¶ 46 The elder girl's therapist testified that the girl described witnessing ongoing domestic violence between her parents. The girl reported that father hit her and her brothers, and that it was scary when mother and father fought. The therapist had diagnosed the girl with post-traumatic stress disorder.

¶ 47 The caseworker testified that the children's therapists had recommended against beginning visitation with father due to the children's continued disclosure of physical abuse and their fear of him. She also testified that father had completed only four to six sessions of dialectical behavioral therapy out of twenty-six. He had made very little progress on his treatment plan. He had not taken ownership or acceptance of his negative impact on the children when they were in his care. The caseworker opined that it was not in the children's best interests to maintain a relationship with father.

¶ 48 Thus, we conclude that the record supports the juvenile court's decision to terminate father's parental rights without affording him additional time to comply with his treatment plan.

## D.    Less Drastic Alternatives

¶ 49    Mother and father contend that the juvenile court erred when it found that an allocation of parental responsibilities (APR) to the maternal grandfather was not a viable less drastic alternative to termination of their parental rights.  We disagree.

¶ 50    A juvenile court must consider and eliminate less drastic alternatives before entering an order of termination.  *D.B-J.*, 89 P.3d at 531.  In doing so, the court must give primary consideration to the child's physical, mental, and emotional conditions and needs. *D.P.*, 160 P.3d at 356; *see also* § 19-3-604(3).  The court may consider whether an ongoing relationship with the parent would benefit the child.  *See People in Interest of L.M.*, 2018 COA 57M, ¶ 29; *People in Interest of J.L.M.*, 143 P.3d 1125, 1127 (Colo. App. 2006).  Long-term placement with a relative is not a viable less drastic alternative if the child needs a stable, permanent home that can be assured only by adoption.  *People in Interest of M.B.*, 70 P.3d 618, 627 (Colo. App. 2003).

¶ 51    We must accept the juvenile court's determination that no less drastic alternative to termination was available unless the finding is

so clearly erroneous as to find no support in the record. *People in Interest of C.Z.*, 2015 COA 87, ¶ 64.

¶ 52    The juvenile court found that an ongoing relationship with the parents would not benefit the children. The children had no relationship with father, whom they had not seen in over a year. And there was no evidence of a healthy attachment bond between mother and the children, who did not see mother as a caregiver or someone who would keep them safe. The court found that the children needed to know that they were in a permanent home and their father could not get to them. Testimony by the caseworker and the psychologist supports these findings.

¶ 53    Other evidence at the termination hearing supported the juvenile court's finding that mother would likely violate the conditions of an APR by allowing father to have contact with the children. The caseworker testified that mother had been diagnosed with a dependent personality disorder, which led her to stay in unhealthy relationships to avoid being alone. Mother testified that, despite the protection order in place after the prior dependency and neglect proceeding, she had habitually called father to help with the

21

boys when she became frustrated because they behaved better when he was there.

¶ 54    The grandfather testified he did not trust mother to keep father away from the children.  He said protection orders had failed to protect the children and that adoption would make sure that line was never crossed again.

¶ 55    We therefore conclude that the record supports the juvenile court's finding that an APR to the grandfather was not a viable less drastic alternative to termination of parental rights.

## III.    Conclusion

¶ 56    The judgment is affirmed.

JUDGE TAUBMAN and JUDGE BERGER concur.