25CA0283 Peo in Interest of HHM 09-18-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA0283
Douglas County District Court No. 22JV30075
Honorable Ben L. Leutwyler III, Judge

The People of the State of Colorado,

Appellee,

In the Interest of H.H.M., a Child,

and Concerning A.R.M. and A.A.M.,

Appellants.

JUDGMENT AFFIRMED

Division V
Opinion by JUDGE FREYRE
Pawar and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 18, 2025

Jeffrey A. Garcia, County Attorney, Valerie Brewster, Senior Assistant County Attorney, Castle Rock, Colorado, for Appellee

Debra W. Dodd, Guardian Ad Litem

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant A.R.M.

The Morgan Law Office, Kristofr P. Morgan, Colorado Springs, Colorado, for Appellant A.A.M.

¶ 1     In this dependency and neglect action, A.R.M. (father) and A.A.M. (mother) appeal the judgment terminating their parent-child legal relationships with H.H.M. (the child).  We affirm.

## I.     Background

¶ 2     In 2020, the Douglas County Department of Human Services (the Department) received a referral after the then-newborn child's umbilical cord tested positive for illegal substances.  The child was adjudicated dependent or neglected and the family participated in a dependency and neglect action.  In February 2022, the dependency and neglect action closed successfully with the child in the custody of her parents.  However, just one month later the Department received another referral due to a domestic violence incident between mother and father.  The Department opened a non-court-involved voluntary case and, in September 2022, filed a petition in dependency and neglect raising concerns that mother and father were not following safety plans to address domestic violence between them.  The petition also raised concerns about mother's substance dependence and both parents' mental health.  The court granted mother temporary custody of the child, with protective supervision by the Department.

¶ 3    The court again adjudicated the child dependent and neglected and adopted treatment plans for both parents. After mother tested positive for methamphetamine in January 2023, the juvenile court granted temporary custody of the child to the Department.

¶ 4    In April 2024, the Department and the child's guardian ad litem (GAL) moved to terminate both parent's parental rights. The parties agreed to continue the hearing scheduled for August 2024 to give mother more time to continue substance dependence treatment. Five months later, the juvenile court terminated mother and father's parental rights following a contested hearing.

## II.    Father's Treatment Plan

¶ 5    Father contends that the juvenile court erred in finding his treatment plan was appropriate. We disagree.

### a. Standard of Review and Applicable Law

¶ 6    The purpose of a treatment plan is to preserve the parent-child legal relationship by assisting the parent in overcoming the problems that required intervention into the family. *People in Interest of L.M.*, 2018 COA 57M, ¶ 25. Therefore, an appropriate treatment plan is one that is approved by the court, relates to the child's needs, and provides treatment objectives that are reasonably

2

calculated to render the parent fit to provide adequate parenting to the child within a reasonable time. § 19-1-103(12), C.R.S. 2025; *People in Interest of K.B.*, 2016 COA 21, ¶ 13. A juvenile court abuses its discretion in formulating a treatment plan when its actions are manifestly arbitrary, unreasonable, or unfair, or based on an erroneous understanding or application of the law. *People in Interest of M.W.*, 2022 COA 72, ¶¶ 12, 32.

¶ 7 The appropriateness of a treatment plan is determined by its likelihood of successfully reuniting the family, which we assess based on facts existing at the time the juvenile court approved the plan. *People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005). The fact that a treatment plan is not ultimately successful does not mean that it was inappropriate when the court approved it. *People in Interest of M.M.*, 726 P.2d 1108, 1121 (Colo. 1986).

### b. Analysis

¶ 8 The juvenile court adopted father's treatment plan in November 2022 with father's agreement. The plan required him to (1) maintain communication with the Department; (2) complete a domestic violence evaluation and comply with the recommendations; (3) cooperate with probation and the courts

3

regarding his criminal cases; and (4) complete a mental health evaluation and comply with any recommendations. The plan stated that "if [father] becomes incarcerated, his treatment plan will be reassessed and then modified to include the treatment programs available through the DOC facility or jail, if necessary."

¶ 9 In January 2023, father's probation was revoked, and he was sentenced to the Department of Corrections (DOC).

¶ 10 The juvenile court found that the treatment plan was appropriate. Because father questioned whether the terms of the treatment plan became inappropriate after his incarceration, we may presume that the court considered his argument and applicable evidence when making this finding. *See In re Marriage of Hatton*, 160 P.3d 326, 329-30 (Colo. App. 2007) (appellate court may presume that the district court considered evidence presented, even if the order does not expressly reflect consideration of all relevant circumstances). The court recognized that domestic violence treatment was not available to father after his incarceration but nonetheless found that the need for participation in domestic violence assessment and treatment remained "significant" given the risk of physical and emotional harm to the child.

¶ 11    The record supports these findings.  Father was incarcerated due to a domestic violence incident that occurred in front of the child.  This incident resulted in the Department re-engaging with the family after the first dependency and neglect case closed.  The requirements that father engage in domestic violence and mental health evaluations were designed to mitigate the risk of future domestic violence incidents and facilitate the safe reunification of the family.  Although "changed circumstances may render a treatment plan, previously approved at a dispositional hearing, no longer appropriate," *People in Interest of Z.P.S.*, 2016 COA 20, ¶ 26, the plain language of the treatment plan provides that it will be "modified . . . if necessary," not automatically at father's sentencing. The court's finding that the child still needed father to address domestic violence amounts to a finding that removing this component of the treatment plan was not necessary.  We discern no abuse of discretion in this finding.

¶ 12    Father also contends that the treatment plan was not appropriate because the Department did not fulfill its promise to reassess the treatment plan after father's incarceration.  But a department's later efforts to implement the terms of a treatment

5

plan have no bearing on whether the plan was appropriate when it was adopted. *People in Interest of A.N-B.*, 2019 COA 46, ¶ 26. We therefore discern no error in the court's finding that the treatment plan was appropriate.

### III. Reasonable Efforts

¶ 13 We next consider whether the juvenile court erred in finding that the Department provided reasonable efforts where the Department failed to follow through on its promise to reassess father's treatment plan. Father also contends that the court erred in finding the Department made reasonable efforts because it did not comply with the reporting requirements established by section 19-3-508(1)(e)(III), C.R.S. 2025.

### a. Standard of Review and Applicable Law

¶ 14 Whether a department has met its obligation to make reasonable efforts to reunify a family is a mixed question of fact and law. *People in Interest of A.S.L.*, 2022 COA 146, ¶ 8. We review the juvenile court's factual findings related to reasonable efforts for clear error, but we review de novo the court's legal determination, based on those findings, as to whether the Department satisfied its reasonable efforts obligation. *Id.*

6

¶ 15    Before a court may terminate parental rights under section 19-3-604(1)(c), C.R.S. 2025, the county department of human services must make reasonable efforts to rehabilitate parents and reunite families.  §§ 19-1-103(114), 19-3-100.5(1), 19-3-208, 19-3-604(2)(h), C.R.S. 2025.  "Reasonable efforts" is defined as the "exercise of diligence and care . . . for children and youth who are in foster care or out-of-home placement."  § 19-1-103(114).

¶ 16    Services provided in accordance with section 19-3-208 satisfy the reasonable efforts standard.  § 19-1-103(114).  As relevant here, section 19-3-208 requires a department to provide individual case plans for the provision of services.  § 19-3-208(2)(b).  In evaluating reasonable efforts, we also consider whether the department complied with the terms of the case plan.  *A.N-B.*, ¶ 26.

b. The Department's Failure to Reassess the Treatment Plan

¶ 17    When father's treatment plan was adopted in November 2022, father knew that he would likely be incarcerated as a result of a pending probation revocation in a criminal case.  At the dispositional hearing, father agreed with the terms of the Department's proposed treatment plan but asked the court to add an obligation that "if [father] becomes incarcerated, his treatment

7

plan will be reassessed and then modified to include the treatment programs available through the Department of Corrections facility or jail, if necessary." At the hearing, the Department agreed that "if there were to be a subsequent incarceration, we would have the obligation to assess if the treatment plan continued to be appropriate." Father was subsequently incarcerated and, by the time of the termination hearing, had been incarcerated in the DOC for almost two years.

¶ 18     The Department and GAL contend that the terms of father's treatment plan did not necessarily require court action because the treatment plan only needed to be "modified . . . if necessary." We agree. However, the plan did require the Department to, at a minimum, internally reassess father's treatment plan. The caseworker's testimony made clear that she made no efforts to do so. While the Department began providing therapeutically supervised family time six months after father was incarcerated, the caseworker did not make any attempts to talk to father's case manager at the DOC facility until just one month before the termination hearing. Even then, the caseworker never asked the

DOC case manager what programs were available to father through the facility.

¶ 19 Father's treatment plan did not require him to participate in any treatment unless doing so was recommended by a domestic violence or mental health evaluation. He testified that he was in the community for nine months before his incarceration. Uncontested testimony established that father did not engage in any evaluations or treatment during this time.

¶ 20 The Department could have — but failed to — communicate with the DOC facility to determine if the facility either (1) offered the mental health and domestic violence evaluations required by the treatment plan or (2) permitted a provider contracted with the Department to enter the facility to administer the necessary evaluations.

¶ 21 Nevertheless, the juvenile court could have reasonably determined that the Department's failure to reassess the treatment plan after father's incarceration was mitigated by his earlier failure to complete the evaluations before his incarceration. *See People in Interest of A.V.*, 2012 COA 210, ¶ 12 (the court may consider a parent's unwillingness to participate in treatment when evaluating

whether a department made reasonable efforts). Furthermore, the record contains no evidence that funding was available for the Department to provide a mental health evaluation or services that might be recommended by an evaluation at the DOC facility. *See* § 19-3-208(2)(d)(IV) ("[d]iagnostic, mental health, and health-care services" to be made available based on the availability of funding and as determined necessary and appropriate by individual case plans).

¶ 22    In any event, whether a department made reasonable efforts "must be measured holistically rather than in isolation with respect to specific treatment plan objectives." *People in Interest of My.K.M. v. V.K.L.*, 2022 CO 35, ¶ 35. Father does not contend that the Department's efforts to meet other terms of his treatment plan were not reasonable. The juvenile court, with record support, found that the Department maintained contact with father during his incarceration and provided therapeutic family time.

¶ 23    Furthermore, father does not explain what he believes should have resulted from the Department's reevaluation of the treatment plan, given the limited resources available at the DOC facility. At the termination hearing, father agreed that domestic violence

impacted the child and was the basis for the dependency and neglect case. The treatment plan could not be "modified to include the treatment programs available through the Department of Corrections" because testimony from father, his DOC case manager, and the Department's caseworker suggested that domestic violence and mental health evaluations were not available. The lack of resources at the DOC facility did not invalidate the child's need for father to address domestic violence. *See K.B.*, ¶ 14 (A treatment plan must "adequately address the safety concerns identified during the assessment of the family."); *see also* § 19-1-103(12) (A treatment plan must "relate[] to the child's needs."). Moreover, father never explained why he was unable to engage in domestic violence and mental health evaluations during the time preceding his incarceration.

¶ 24 Given this record, we discern no error in the court's conclusion that the Department provided reasonable efforts to rehabilitate father and reunify the family.

IV. Compliance with Section 19-3-508

¶ 25 The Department and GAL contend that any violation of section 19-3-508(1)(e)(III) falls outside the Department's reasonable efforts

11

obligation under section 19-3-208 and, therefore, should not be considered as a reasonable efforts issue. We need not decide whether father's closing statement was sufficient to preserve this issue; regardless of whether father failed to preserve the issue or whether we address it on the merits, the outcome is the same. *See L&R Expl. Venture v. Grynberg*, 271 P.3d 530, 536 (Colo. App. 2011) (declining to resolve an issue where outcome would not change); *People in Interest of R.R.*, 607 P.2d 1013, 1015 n.2 (Colo. App. 1979).

¶ 26     If, after disposition is entered, a child's parent becomes continuously incarcerated for more than thirty-five days, "the caseworker assigned to the case, upon knowledge of incarceration," shall provide information detailing either (1) "the services and treatment available to a parent at the facility or jail where the parent is incarcerated" or (2) "the caseworker's efforts to obtain the information at the next scheduled court hearing." § 19-3-508(1)(e)(III).

¶ 27     Father was sentenced to the DOC in January 2023. The statutory provision at issue took effect January 2024. Ch. 191, sec. 6, § 19-3-508(1)(e)(III), 2023 Colo. Sess. Laws 957. The next

dependency and neglect hearing was in February 2024. In her court letter for that hearing, the caseworker reported that father was "working to complete offered services while in DOC" including anger management. In the next court letter, filed in April 2024, the caseworker reported that father "engages in services as he is permitted through the correctional facility" including the Reimagine program, Reading for Success, psychiatry, and family time. As father points out, the caseworker admitted that she did not attempt to obtain information directly from the DOC facility. Instead, she relied on information provided by father and included that information in the court reports submitted after section 19-3-508(1)(e)(III) took effect. This fulfills the statute's narrow obligations.[1]

---

[1] Father's contention highlights a key difference between section 19-3-508(1)(e)(III) — applicable here because father's incarceration occurred after the dispositional order was entered — and section 19-3-508(1)(e)(I), which applies when a parent is incarcerated while a treatment plan is being developed. While section 19-3-508(1)(e)(I) requires a caseworker to "communicate with the facility or jail where the parent is incarcerated regarding the requirements of the court-ordered treatment plan," section 19-3-508(1)(e)(III) contains no such requirement.

## V. Fit in a Reasonable Time

¶ 28   Mother contends that the court erred by finding that she was unfit and unlikely to become fit within a reasonable time. We discern no basis for reversal.

¶ 29   An unfit parent is one whose condition or conduct renders him or her unable to give a child reasonable parental care. *People in Interest of D.P.*, 160 P.3d 351, 353 (Colo. App. 2007). Reasonable parental care requires, at a minimum, that the parent provide nurturing and protection adequate to meet the child's physical, emotional, and mental health needs. *People in Interest of A.J.*, 143 P.3d 1143, 1152 (Colo. App. 2006).

¶ 30   In determining whether a parent's conduct or condition is likely to change within a reasonable time, "the court may consider whether any change has occurred during the proceeding, the parent's social history, and the chronic or long-term nature of the parent's conduct or condition." *People in Interest of S.Z.S.*, 2022 COA 133, ¶ 24. What constitutes a reasonable time is fact specific and must be determined by considering the physical, mental, and emotional conditions and needs of each particular child. *Id.* at ¶ 25. When, as here, a child is under six years old at the time of

the filing of the petition, the action is subject to the expedited permanency planning provisions and the court must consider the child's need to be placed in a permanent home as expeditiously as possible. §§ 19-1-102(1.6), 19-1-123, C.R.S. 2025.

¶ 31 The juvenile court found mother unfit in large part because of her continued use of substances. The court noted that this was the child's second dependency and neglect action and found that mother consistently failed to follow through with recommended services. The court found mother's testimony to be "less than credible" regarding her plan to begin an intensive outpatient program for substance dependence the day after the termination hearing, noting she had made similar unfulfilled promises before.

¶ 32 The record supports these findings. The caseworker testified that the Department was involved in all but one month of the child's life. While acknowledging that mother and the child "have a great bond," the caseworker testified that "substance use is my number one concern."

¶ 33 Mother contends that she demonstrated "consistent, significant changes" during the case. The juvenile court found that mother successfully completed inpatient substance dependence

treatment, and the testimony was uncontested that mother last used methamphetamine four months before the termination hearing. These are significant achievements. But at the termination hearing, mother agreed that she had not consistently participated in sobriety monitoring, had not engaged in treatment for four months, and would test positive for marijuana if tested that day.

¶ 34 The caseworker, a child protection expert, opined that marijuana alone "can be a harmful substance when you have a young child, especially with high needs," because a parent under the influence of marijuana is "not as attentive to the child's needs." And the evidence was uncontested that the child had unusually high needs. The child's pediatric nurse practitioner testified that the child was born with congenital anomalies and regularly saw a team of specialists to address issues with eating, breathing, and a developmental delay. The pediatric nurse practitioner testified that the child needed to be closely monitored at all times for potential complications with her feeding tube, feeding pumps, and breathing.

¶ 35 Notably, mother received additional time to become fit. Recall, the termination hearing was originally scheduled for August 2024.

16

In the month before the scheduled hearing, mother went to, and successfully completed, inpatient treatment for her substance dependance. But after that, mother did not continue substance dependence treatment or follow through with other services.

¶ 36    We therefore conclude that the juvenile court did not err by declining to give mother even more time to achieve fitness. *See S.Z.S.*, ¶¶ 24, 28-29 (the court need not give a parent additional time, even when there has been recent progress on the treatment plan).

## VI.    Less Drastic Alternative

¶ 37    Mother next contends that the juvenile court erred in finding that there was no less drastic alternative to termination. More specifically, she argues that "despite the availability of family placements who wanted to provide permanency for the child, the [juvenile] court rejected these less drastic alternatives." Again, we discern no error.

¶ 38    The juvenile court must consider and eliminate less drastic alternatives before it terminates the parent-child legal relationship. *People in Interest of D.P.*, 181 P.3d 403, 408 (Colo. App. 2008). In considering less drastic alternatives, the court must base its

decision on the best interests of the child, giving primary consideration to the child's physical, mental, and emotional needs. § 19-3-604(3); *People in Interest of J.L.M.*, 143 P.3d 1125, 1126 (Colo. App. 2006). Notably, it is not enough for a placement to be "available"; instead, any less drastic alternative must also be in the child's best interests. *People in Interest of A.M. v. T.M.*, 2021 CO 14, ¶¶ 30-32.

¶ 39      Even when a placement provider or potential placement provider is willing to enter into an allocation of parental responsibilities (APR) with a parent, the court may properly determine that such an arrangement does not adequately meet the child's needs. *See People in Interest of T.E.M.*, 124 P.3d 905, 910 (Colo. App. 2005) (permanent placement with a relative may not be a viable alternative if it does not provide adequate permanence or otherwise meet the child's needs); *People in Interest of D.B-J.*, 89 P.3d 530, 531 (Colo. App. 2004) (a proposed placement is not a less drastic alternative to termination if the placement provider lacks appreciation of a child's needs and conditions); *A.M.*, ¶ 31 ("Primary consideration of the child's physical, mental, and emotional condition and needs requires more than a mere assessment of

adequacy in order to satisfy the overall intent of the Children's Code.").

¶ 40 The juvenile court found that an APR was "not reasonable" and there was no less drastic alternative that would serve the child's best interests. In so doing, the court noted testimony regarding the possible availability of the child's maternal grandparents, paternal grandparents, and paternal aunt as potential placements. However, the court credited the caseworker's opinion that an APR was "not viable" because the child was "only four years old and needs a stable home with caregivers who can meet her needs until at least age [eighteen]." The court found that the child needed the "stability and finality" that only termination could provide.

¶ 41 The record supports these findings. The caseworker testified that the child had high medical needs and needed consistency and diligence in following through on medical procedures, therapeutic programs, and educational services. The caseworker opined that termination best served the child's needs and conditions, and that the child deserved permanency and stability. The caseworker opined that termination was in the child's best interests.

¶ 42 Mother emphasizes her "loving and bonded relationship" with the child, and the positive relationships that the child had with her extended biological family. The court may weigh a number of factors when determining if a less drastic alternative is appropriate, including the child's relationship with a parent. *People in Interest of A.R.*, 2012 COA 195M, ¶ 38. However, no single factor is dispositive. *Id.* (noting that the court *may* consider "various factors," such as whether an ongoing relationship would benefit the child). Because we cannot reweigh the evidence, we reject mother's assertion. *S.Z.S.*, ¶ 29.

## VII. Disposition

¶ 43 The judgment is affirmed.

JUDGE PAWAR and JUDGE YUN concur.